Beverly A. WHITBECK, Appellant,

v.

VITAL SIGNS, INC., Appellee.

No. 96–7193.

United States Court of Appeals, District of Columbia Circuit.

Argued April 2, 1997

Decided June 20, 1997

Michael G. Kane, Washington, DC, argued the cause, for appellant. With him on the briefs were Vicki G. Golden and David R. Cashdan.

Lisa S. Grosskreutz, Morristown, NJ, argued the cause, for appellee. With her on the briefs were Pamela J. Moore, Morristown, NJ, and Joseph P. Harkins, Washington, DC.

Robert J. Gregory, Attorney, Equal Employment Opportunity Commission, argued the cause, for amicus curiae Equal Opportunity Employment Commission. With him on the brief were C. Gregory Stewart, General Counsel, Louisville, KY, J. Ray Terry, Jr., Deputy General Counsel, Memphis, TN, and Vincent J. Blackwood, Assistant General Counsel, Washington, DC.

Before: EDWARDS, Chief Judge, WALD and TATEL, Circuit Judges.

TATEL, Circuit Judge:

In this suit under the District of Columbia Human Rights Act, appellant alleges that her employer denied her reasonable accommodation and discharged her because of her disability. Finding her claim barred by her receipt of disability benefits and her requested reasonable accommodation not required by the Act, the magistrate judge entered summary judgment for her employer. We reverse. The receipt of disability benefits does not bar a Human Rights Act suit, and appellant raises genuine issues of material fact with respect to her reasonable accommodation claim.

I

In 1992, appellee Vital Signs, Inc., a medical equipment manufacturing company, took over Biomedical Dynamics for which appellant Beverly Whitbeck was working as a sales representative. During her final year at Biomedical, Whitbeck sold approximately $900,000 of medical equipment, accounting for over ten percent of the company's eight million dollar annual sales. Vital Signs offered Whitbeck a job, guaranteeing her $84,000 for her first year. Whitbeck began working for Vital Signs on September 7, 1992.

In February of 1993, Whitbeck began feeling weakness in her legs. Within a few days she could barely walk. Diagnosed with a tumor on her spinal cord, she had surgery on March 8. Following several weeks of hospitalization and rehabilitation and able to move around only with the help of a walker or wheelchair, Whitbeck returned home on May 7.

Almost immediately, Whitbeck began working from her home office, increasing her work load as she grew stronger. In July, with the aid of a driver she hired and paid (Vital Signs subsequently reimbursed her), Whitbeck again began calling on customers. With her car outfitted with hand controls and a wheelchair rack, Whitbeck was making sales calls on her own by September of 1993. Dispensing with her wheelchair in early 1994, Whitbeck was able to visit her customers with the aid of a cane and a sample bag on wheels.

Maintaining regular customer contacts by phone, fax, and mail, Whitbeck made field calls only two or three days a week—fewer than her pre-disability four-and-a-half-day-a-week average. Despite the decrease in sales calls, Whitbeck ranked in the forties out of more than one hundred salespeople, performing better than other sales representatives from her region.

Sometime in early 1994 and no longer receiving her guaranteed first-year salary, Whitbeck applied for and began receiving "residual disability" benefits from her private insurer, Royal Maccabees. Maccabees pro-

vides residual disability benefits to insured persons who, though working, have had their income reduced by more than 20% as a result of accident or sickness.

On April 15, 1994, Whitbeck visited her neurologist, Dr. Jorge Kattah, telling him that she was having difficulty doing her job because she had trouble walking long distances. Explaining that her condition was unlikely to improve, Kattah suggested she use a motorized cart to move around at work. As a result, in an event central to this case, Whitbeck raised the issue of a motorized cart during a conversation with her supervisor, Sherry Henricks, on April 28, 1994. Whitbeck's and Henricks's versions of this conversation differ significantly. According to Whitbeck, over lunch she told Henricks that she would like to use a motorized cart to get around at work, to which Henricks responded "it would not work; it was not a good idea.... It wouldn't look right." Whitbeck Dep. at 121 (Feb. 8, 1996). Henricks then asked Whitbeck if Vital Signs could begin advertising for Whitbeck's replacement. Henricks recalls the conversation differently. According to her, at some point during that day, she and Whitbeck did discuss whether Whitbeck "wanted to continue working for Vital Signs," with Whitbeck indicating that although her doctor recommended a "scooter, ... it was something that she just couldn't see herself doing" and would instead like to resign. Henricks Dep. at 68–71 (Feb. 7, 1996).

Some time after this meeting but before May 16, 1994, Whitbeck stopped working and Vital Signs removed her from the payroll. To maintain health benefits, Whitbeck went on Family and Medical Leave. In May she applied for and began receiving total disability benefits from Maccabees. At the suggestion of Henricks, she applied for long-term disability benefits from Vital Signs' insurer, Mutual of Omaha, but because her condition was "pre-existing," benefits were denied. On August 11, 1994, Whitbeck applied for Social Security disability benefits, which were awarded on January 13, 1995.

Although receiving no pay, Whitbeck continued checking her voice mail and responding to customers. She also proposed, first to Henricks and then in a letter dated August 25, 1994, to Vital Signs Chief Executive Officer Terry Wall, that she work part-time preparing promotional materials for Vital Signs. Vital Signs never responded. Whitbeck was officially terminated on November 21, 1994.

Charging Vital Signs with failure to reasonably accommodate her disability and discriminatory discharge in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C.Code Ann. § 1–2501 et seq. (1992), Whitbeck filed suit in the Superior Court for the District of Columbia. Citing diversity jurisdiction, Vital Signs removed the case to the United States District Court for the District of Columbia where, with the parties' consent, it was referred to a magistrate judge for all further proceedings.

Vital Signs moved for summary judgment, arguing that Whitbeck's application for and receipt of disability benefits barred her disability discrimination claims. Agreeing, the magistrate judge entered summary judgment for Vital Signs, reasoning that because Whitbeck "ha[d] not established that she was able to perform the essential functions of her position since she applied for and [was] receiving both monthly Social Security and Maccabees disability payments effective six months before her termination date" she did not fit the statutory definition of disability. Whitbeck v. Vital Signs, Inc., 934 F.Supp. 9, 16 (D.D.C.1996). In the alternative, the magistrate judge concluded that "the reasonable accommodation that Ms. Whitbeck sought is not required under the law." Id.

In this appeal by Whitbeck, we review the grant of summary judgment de novo. Tao v. Freeh, 27 F.3d 635, 638 (D.C.Cir.1994). As the agency charged with enforcing the Americans with Disabilities Act, the Equal Employment Opportunity Commission sought and received leave to file a brief as amicus curiae. Pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure, the EEOC notified this panel of the Social Security Administration's amicus curiae brief in Swanks v. WMATA, 116 F.3d 582 (D.C.Cir.1997), a case we also decide today.

## II

Intended to "secure an end in the District of Columbia to discrimination for any reason other than that of individual merit," the DCHRA prohibits discrimination on several grounds, including "discrimination by reason of ... physical handicap." D.C.Code Ann. § 1–2501 (1992). At the time of the critical events in this case, the DCHRA defined "physical handicap" as "a bodily or mental disablement which may be the result of injury, illness or congenital condition for which reasonable accommodation can be made." *Id.* § 1–2502(23) (repealed June 28, 1994); *see* D.C.Code Ann. § 49–304(a) (Supp.1996) ("[T]he repeal of any act of the Council shall not release or extinguish any penalty, forfeiture, or liability incurred pursuant to the act...."). The Act makes it unlawful for an employer to:

discharge ... or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment[;] ... or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee.

*Id.* § 1–2512(a)(1) (1992). District of Columbia courts interpreting the DCHRA "have generally looked [for guidance] to cases from the federal courts" arising under federal civil rights statutes. *Benefits Communication Corp. v. Klieforth,* 642 A.2d 1299, 1301–02 (D.C.1994). In particular, when determining the elements of a *prima facie* case and the allocation of burdens and order of proof in a disability discrimination case under the DCHRA, District of Columbia courts rely on cases decided under analogous federal anti-discrimination laws. *American Univ. v. District of Columbia Comm'n on Human Rights,* 598 A.2d 416, 422 (D.C.1991); *Miller v. American Coalition of Citizens with Disabilities, Inc.,* 485 A.2d 186, 189–90 (D.C. 1984).

 We begin with the magistrate judge's holding that Whitbeck may not maintain this action because she applied for and received public and private disability benefits. As we explain in *Swanks,* the Social Security Ad-ministration's inquiry into an individual's eligibility for disability benefits focuses on the individual's ability to do work generally available in the national economy and does not address the possible effect of accommodation on ability to work. *Swanks,* 116 F.3d at 584–85. According to Whitbeck, she was found disabled at step three of the Social Security Administration's evaluation process. *See Swanks,* 116 F.3d at 584–85 (describing five-step evaluation process). At this step the agency determines whether the individual's disability is "listed" at 20 CFR Part 404, Subpart P, App. 1 (1996). If so, the claimant is found disabled and awarded benefits without any further inquiry. 20 CFR § 404.1520(d). Whitbeck's receipt of disability benefits is thus not at all inconsistent with her claim that she could perform her job with reasonable accommodation. *See Swanks,* 116 F.3d at 586.

 We reach the same conclusion with respect to private disability benefits. Where, as here, an insurer makes disability determinations without regard to whether the insured can work with reasonable accommodation, an award of benefits does not preclude a later claim that the insured can work with accommodation. *See, e.g.,* EEOC ENFORCE-MENT GUIDANCE ON THE EFFECT OF REPRESENTATIONS MADE IN APPLICATIONS FOR BENEFITS ON THE DETERMINATION OF WHETHER A PERSON IS A "QUALIFIED INDIVIDUAL WITH A DISABILITY" UNDER THE AMERICANS WITH DISABILITIES ACT OF 1990 at 17 (Feb. 12, 1997) (noting that because private disability insurance contracts "[f]requently ... make[ ] no allowance for an individual's ability to work with reasonable accommodation[,] .... an individual receiving disability insurance benefits still may be entitled to protection under the ADA"). The residual disability benefits Whitbeck received from Maccabees while still working at Vital Signs are available when the insured is "engaged in [his or her] Regular Occupation and [has his or her] income reduced, due to Accident or Sickness, by at least 20% of [his or her] Prior Income." Maccabees Life Ins. Co., Regular Occupation Amendment. Her receipt of these benefits—benefits available to working disabled persons—is thus not at

all inconsistent with her claim that she could work with accommodation. The same is true with respect to Maccabees' total disability insurance policy; its definition of total disability—"due to Accident or Sickness, [the insured] cannot perform the substantial and material duties of [his or her] regular occupation," *id.*—likewise does not consider the insured's ability to work with reasonable accommodation.

■ The magistrate judge's alternative conclusion—that "Vital Signs was not required ... to create a new part-time position ..." for Whitbeck, *Whitbeck,* 934 F.Supp. at 16—cannot support summary judgment for a very simple reason: Whitbeck has never argued that Vital Signs denied her reasonable accommodation by refusing to give her a new part-time job. Appellant's Br. at 17 n.15; *see* Pl.'s Opp. to Def.'s Mot. for Summ. J. at 1. Instead, Whitbeck claims Vital Signs rejected her request for a motorized cart on April 28, 1994, Pl.'s Compl. at 3–5; Whitbeck Dep. at 120–22; Whitbeck Aff. at 3–4 (Apr. 25, 1996), an allegation that we must credit at this stage of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (At summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). From this, together with evidence in the record that her doctor believed she could do her job with a motorized cart and that Vital Signs had allowed her to work with a wheelchair, a reasonable jury could find that Whitbeck proposed a reasonable accommodation which would allow her to work again as a Vital Signs sales representative. *See, e.g., Riel v. Electronic Data Sys. Corp.,* 99 F.3d 678, 683 (5th Cir.1996) (holding evidence of two proposed accommodations and of company's having provided similar adjustments in the past sufficient to meet summary judgment burden). Whitbeck's August 25 letter to Vital Signs, relied on by the magistrate judge, does not support summary judgment, as a reasonable jury could also conclude that because this letter came after the April 28 conversation with Henricks, Whitbeck asked for a part-time position only because her employer had previously rejected her request for a motorized cart.

Relying on a decision of the District of Columbia Court of Appeals, Vital Signs argues that Whitbeck failed to make out even a prima facie case of discrimination because "she presented herself to Vital Signs, and to her insurance carriers and the Social Security Administration, in a manner which demonstrated that she either was unable or unwilling to perform the responsibilities of her position." Appellee's Br. at 13–14; *see Miller,* 485 A.2d at 190 (quoting *Prewitt v. United States Postal Serv.,* 662 F.2d 292, 309–10 (5th Cir. Unit A Nov.1981)) (" 'To sustain [a] prima facie case, there should ... be a facial showing or at least plausible reasons to believe that the handicap can be accommodated.... ' [S]uch a showing would require, at a minimum, that an employee present herself to the employer as someone willing and able to work, but for a surmountable handicap."). In support of this argument, Vital Signs points to Whitbeck's applications for disability benefits, to her failure to make any further requests for a motorized cart after her conversation with Henricks, to the statement in her August 25 letter to Vital Signs that she was no longer physically able to work as a sales representative, and to her failure to respond to an August 2 letter inquiring into her ability to work and need for accommodation. Again, all of these actions occurred after the April 28 conversation with Henricks. A reasonable jury could therefore find, not only that Whitbeck presented herself on April 28 as willing and able to work with a motorized cart, but also that her post-April 28 actions were understandable, i.e., because Vital Signs had previously denied her request for a motorized cart, she applied for disability benefits, told Vital Signs she could no longer work, and believed she had no obligation to make a subsequent request for a motorized cart or to respond to Vital Signs' letter. *Cf. Hunt–Golliday v. Metropolitan Water Reclamation Dist.,* 104 F.3d 1004, 1012 (7th Cir.1997) ("After an employee's request [for reasonable accommodation], both parties bear responsibility for determining what accommodation is necessary.") (citing *Bultemeyer v. Fort Wayne Community Schools,* 100 F.3d 1281, 1285 (7th Cir.1996)).

Vital Signs also relies on an undated letter from Whitbeck to Dr. Kattah which states "I

am not physically able, after months of trying, to perform the functions [of] my job," as well as Kattah's indication on a Maccabees form dated April 14, 1994, that Whitbeck was totally disabled. To a reasonable jury, however, Whitbeck's statement that she was no longer able to perform her job might be nothing more than an accurate description of her condition—without accommodation, she *was* unable to work. As to the April 14 form, three days later Kattah wrote another of Whitbeck's physicians, stating that Whitbeck was performing her job with assistance and would probably need "some form of transportation such as [a motorized] cart." Because the April 14 form does not address Whitbeck's ability to work with accommodation, and because the record contains evidence that Kattah believed Whitbeck could work with assistance, a jury could reasonably find that Whitbeck would have been able to work with her requested accommodation—a motorized cart.

We reverse and remand for further proceedings consistent with this opinion.

*So ordered.*