Beverly A. **WHITBECK**, Appellant,

v.

**VITAL SIGNS, INC.,** Appellee.

No. 97–7206.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 24, 1998.
Decided Nov. 20, 1998.

Michael G. Kane argued the cause for appellant. With him on the briefs were Vicki G. Golden and David R. Cashdan.

Pamela J. Moore argued the cause for appellee. With her on the brief was Paul J. Kennedy.

Before: EDWARDS, Chief Judge, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

In this appeal from a jury verdict in favor of an employer in a disability discrimination suit, we once again face the question of whether and to what extent the employer may rely on the employee's application for and receipt of disability insurance benefits. Although we held in a previous case that the receipt of such benefits does not bar the employee's claim as a matter of law, we find that where, as in this case, the benefits applications contain information relevant to issues at trial, they may be admitted into evidence.

## I

This is not the first time this litigation has come before us. *See Whitbeck v. Vital Signs, Inc.*, 116 F.3d 588 (D.C.Cir.1997) (*"Whitbeck I"*). Although we described the factual background of this dispute in some detail in our earlier opinion, we revisit those facts again as they relate to the issues before us here.

Appellant Beverly Whitbeck began working as a sales representative for Vital Signs, Inc., a medical equipment manufacturer, in 1992. Because of her outstanding sales performance for another medical equipment company, Vital Signs guaranteed Whitbeck a salary of at least $84,000 for her first year. Diagnosed five months later with a severe spinal cord tumor, Whitbeck underwent surgery, returning home after several weeks of hospitalization and rehabilitation. Although unable to move around without a walker or a wheelchair, Whitbeck began working from home almost immediately, initiating as much client contact as she could over the telephone. As she grew stronger, she gradually increased her workload. With the help of a driver she hired and paid, Whitbeck started making sales calls again in July 1993. She soon outfitted her car with hand controls and a wheelchair rack, enabling her to transport herself to her customers on her own. By early 1994, Whitbeck no longer needed a wheelchair and was able to make sales calls with the aid of a cane.

In the spring of 1994, Whitbeck began to have difficulty walking long distances. Her neurologist discovered that her tumor had regrown. He informed her that her problems with walking were not likely to improve and that she might develop total paraplegia. He recommended that she consider purchasing a motorized cart for making sales calls in the field. A few days later Whitbeck met with a salesperson from a motorized cart manufacturer to explore that possibility.

On April 28, Whitbeck had a conversation with her supervisor, Sherry Henricks, about the possibility of using a motorized cart at work. At trial, Whitbeck and Henricks offered conflicting versions of what they said to each other during that conversation. According to Henricks, Whitbeck was distraught that her tumor had regrown and said that she would not use a motorized cart to make sales calls because she "couldn't see herself" doing that. Henricks testified that Whitbeck explained that she had decided instead to retire on long-term disability. According to Whitbeck's version of the conversation, Henricks flatly refused her request for permission to use a motorized cart, telling her that "it wasn't ... a good idea" because "it wouldn't look right." Whitbeck testified that it was Henricks who suggested that she retire on long-term disability, and that Henricks even asked her if she could begin to advertise the availability of her position immediately.

Shortly after the April 28 conversation, Whitbeck stopped working altogether, and Vital Signs removed her from the payroll. Whitbeck then applied for and began receiving both residual and short-term disability benefits from her private insurer. She also applied for long-term disability benefits through Vital Signs's carrier, Mutual of Omaha. Finding her ineligible because her condition arose less than a year after she began working at Vital Signs, Mutual of Omaha denied her claim. Whitbeck also applied for and began receiving Social Security disability benefits. Vital Signs officially terminated her in November 1994.

■ Whitbeck filed suit in the Superior Court for the District of Columbia, alleging that Vital Signs had discriminated against her because of her disability in violation of the District of Columbia Human Rights Act, D.C.CODE ANN. §§ 1–2501 to 1–2557 (1992) (amended 1994). Vital Signs removed the case to the United States District Court for the District of Columbia based on diversity of citizenship. With the parties' consent, the matter was referred to a magistrate judge. As we explained in *Whitbeck I*, District of Columbia courts determine the elements of a *prima facie* case of disability discrimination under the Human Rights Act based on cases decided under analogous federal antidiscrimination laws. *See Whitbeck I*, 116 F.3d at 591. Thus, Whitbeck's claim required her to demonstrate that Vital Signs refused reasonably to accommodate her disability, and that she could have performed the essential functions of her job had she been so accommodated. *See* Americans with Disabilities Act, 42 U.S.C. §§ 12111(8), 12112 (1994).

The magistrate judge granted summary judgment for Vital Signs, holding that Whitbeck's receipt of disability insurance benefits precluded her as a matter of law from demonstrating that she could have performed the functions of her job with accommodation.

*See Whitbeck v. Vital Signs, Inc.,* 934 F.Supp. 9, 14–15 (D.D.C.1996). We reversed, holding that because the insurance carriers made no inquiry into whether Whitbeck could have performed her job with reasonable accommodation, her application for and receipt of disability benefits did not bar her discrimination claim. *See Whitbeck I,* 116 F.3d at 591–92. Following a three-day trial on remand, the jury returned a verdict for Vital Signs.

■ Whitbeck appeals, asserting various evidentiary errors. We review a trial court's evidentiary rulings for abuse of discretion. *See United States v. Smart,* 98 F.3d 1379, 1386 (D.C.Cir.1996). Even if we find error, we will not reverse an otherwise valid judgment unless appellant demonstrates that such error affected her "substantial rights." FED. R. CIV. P. 61; *Herbert v. Nat'l Academy of Sciences,* 974 F.2d 192, 200 (D.C.Cir.1992).

## II

■ Relying on *Whitbeck I* and its companion case, *Swanks v. WMATA,* 116 F.3d 582 (D.C.Cir.1997), Whitbeck first challenges the magistrate judge's admission into evidence of her applications for disability insurance benefits. In *Whitbeck I,* we held that because the insurers' disability determinations did not take into account whether she could perform the essential functions of her job *with reasonable accommodation*—the critical issue in a disability discrimination suit—the mere fact that Whitbeck had applied for and received private disability insurance benefits did not bar her subsequent disability discrimination claim as a matter of law. *See Whitbeck I,* 116 F.3d at 591–92. We reached the same conclusion in *Swanks* with respect to the receipt of Social Security disability benefits. *See Swanks,* 116 F.3d at 584–87. Whitbeck argues that under the logic of these opinions her benefits applications had no relevance to her case because they made it no more likely that she would have been unable to do her job if Vital Signs had accommodated her.

We agree with Whitbeck that the simple fact that she applied for and received disability insurance benefits is not at all probative, as a matter of fact, of whether she can perform her job with accommodation. Although the fact that she applied for and received benefits obviously relates to whether she has a disability—a fact never contested by plaintiffs in disability discrimination cases—it has nothing to do with the question of reasonable accommodation. Reasonable accommodation assumes the presence of a disability and turns on matters such as job restructuring, modification of work schedules, and acquisition of assistive devices. *See* 42 U.S.C. § 12111(9). Accordingly, Vital Signs could not have used the mere fact that Whitbeck had applied for benefits to establish that she was so disabled that she could not perform her job even with reasonable accommodation.

Whitbeck's argument, however, fails to distinguish between the *act* of applying for benefits and the *information contained in* the applications. As we stated in *Swanks,* an application for disability benefits would certainly be relevant if the claimant represented in it that she could not do her job even with accommodation. *Swanks,* 116 F.3d at 587. In this case, for example, the neurologist's statement to Mutual of Omaha, in which he answered "no" to the question whether Whitbeck's job could be "modified to allow for handling with impairment," was clearly relevant to her claim that she could perform her job with accommodation.

Whitbeck's argument also disregards the relevance of her application for long-term disability benefits to Vital Signs's alternative theory of defense. In addition to arguing that Whitbeck could not perform the essential functions of her job, Vital Signs contended, relying on Henricks's version of the April 28 conversation, that Whitbeck never even requested an accommodation and chose instead to try to retire on longterm disability. Toward that end, Vital Signs sought to prove that Whitbeck believed that she was eligible to receive about $45,000 per year in longterm benefits from Vital Signs's insurance carrier. Vital Signs argued that because these benefits were to be calculated as a function of Whitbeck's earnings over the previous twelve months, and because that number was decreasing steadily—she no longer received a guaranteed salary and her disabil-

ity made it difficult for her to earn commissions—Whitbeck decided to retire immediately rather than watch the amount of her benefits entitlement wither away while she struggled to restore her earnings to their former level. According to Vital·Signs, when Whitbeck later learned that she had been denied long-term disability benefits, she fabricated her story that Henricks had refused her request for permission to use a motorized cart. Viewed in light of this theory, Whitbeck's benefits applications certainly contained relevant information. They revealed, for example, that Whitbeck had been unable to work full time since July 1993, that her lack of "stamina" and "endurance" prevented her from spending a full day making sales calls, and that she did not know when she could resume working full time. All of this information was probative of whether Whitbeck had a financial incentive to retire of her own volition, and thus whether she had actually asked Henricks for an accommodation.

Indeed, given Vital Signs's argument that Whitbeck never asked for an accommodation, neither *Whitbeck I* nor *Swanks* prohibited Vital Signs from introducing even her act of applying for disability benefits. After all, in order to prove its theory that the unexpected denial of long-term disability benefits precipitated her alleged lie about the conversation with Henricks, Vital Signs needed to demonstrate that Whitbeck had actually applied for such benefits.

■ Whitbeck argues that even if the applications were relevant, the magistrate judge still should have excluded them as unduly prejudicial. *See* Fed. R. Evid. 403. This argument, however, rests on the assumption that Vital Signs offered the applications only to show that she was unable to do her job. But because Vital Signs also offered the applications to establish that Whitbeck never actually requested an accommodation, and because Whitbeck failed to demonstrate that any unfair prejudice that might have flowed from their admission substantially outweighed their relevance for that additional purpose, the magistrate judge did not abuse his discretion in admitting the applications.

■ As Whitbeck points out, admitting the applications without an explanatory instruction ran the risk that the jury would make the same mistake that the magistrate judge originally made on summary judgment: The jury might conclude from the mere fact that she had applied for and received benefits that she could not perform the functions of her job even if reasonably accommodated. An instruction might have explained to the jury the difference between obtaining disability benefits and prevailing in a disability suit, emphasizing that both can be pursued simultaneously because the former takes no account of the possibility of accommodation. An instruction also might have explained that both the act of applying and the information revealed in the application forms could be relevant to issues other than the possibility of accommodation.

Whitbeck, however, did not request such a limiting instruction at the time that Vital Signs introduced her benefits applications. Instead, she proposed the following instruction at the end of the trial, which the magistrate judge rejected:

> I specifically instruct you that the application for and the receipt by Ms. Whitbeck of disability benefits is not at all inconsistent with her claim that she could perform her job with a motorized scooter.

Whitbeck evidently based this instruction on our statement in *Whitbeck I* that "Whitbeck's receipt of disability benefits is thus not at all inconsistent with her claim that she could perform her job with reasonable accommodation." *Whitbeck I*, 116 F.3d at 591 (citing *Swanks*, 116 F.3d at 586). But that statement spoke only to the *act* of receiving benefits. As we explained earlier, the simple fact that Whitbeck applied for and received benefits is not at all probative of whether she could perform her job with accommodation, *see supra* at 1372, the only question at issue on summary judgment in *Whitbeck I*. Here, Whitbeck's proposed instruction added the words "the application for" to our language from *Whitbeck I*, thus introducing ambiguity as to whether the instruction referred just to the act of applying for benefits or also to information contained in the applications. The jury could have interpreted the proposed

instruction to mean that in determining whether Whitbeck could have done her job with accommodation, it could not consider evidence contained in the applications such as her neurologist's statement that her job could not be modified to accommodate her disability. The proposed instruction might also have led the jury to believe that it could not consider the applications and information they contained for other purposes, such as determining whether the denial of long-term benefits might have motivated Whitbeck to lie about her conversation with Henricks. Because the magistrate judge was under no obligation to give a misleading instruction, *see Joy v. Bell Helicopter Textron, Inc.,* 999 F.2d 549, 557 (D.C.Cir.1993), he did not err in rejecting Whitbeck's. Moreover, even assuming that the potential for prejudice gave the magistrate judge some obligation to rectify the flaws in her proposed instruction, the failure to do so in this case was harmless because Vital Signs never suggested at trial that the mere fact that Whiteck applied for benefits was inconsistent with her discrimination claim.

## III

■ Whitbeck next argues that the magistrate judge erred in refusing to allow her to testify about why she never complained to Henricks's supervisor after Henricks allegedly denied her request to use a motorized cart. Whitbeck sought to explain to the jury that she had not gone to Henricks's supervisor because she feared his reaction. To bolster this explanation, she wished to testify that Henricks had previously told her that Henricks's supervisor had targeted Whitbeck's sales territory for elimination. The magistrate judge refused to allow Whitbeck to recount Henricks's out-of-court statement, ruling that the testimony was hearsay. Whitbeck now urges (as she did to the magistrate judge) that she offered Henricks's statement not for its truth, but only to demonstrate her state of mind.

We have no doubt that the magistrate judge erred in excluding this testimony. At trial, Vital Signs elicited testimony from numerous witnesses that Whitbeck was extraordinarily headstrong—not "the type of person to take no for an answer and just walk away

if she wanted something." Tr. 10/28/97 at 107. Vital Signs's theory, as the company eventually explained to the jury in closing, was that Whitbeck's failure to complain to anybody else at Vital Signs after Henricks supposedly denied her request for an accommodation made that story unbelievable; someone "with Beverly Whitbeck's getup-and-go and desire and ambition and motivation," Vital Signs told the jury, "would [not] have walked away and [would have] gone to someone else." Tr. 10/29/97 at 83. It was therefore understandable that during her redirect examination, by which time Vital Signs had already introduced testimony about her assertiveness, Whitbeck tried to explain her failure to appeal Henricks's alleged decision by establishing that she thought talking to Henricks's supervisor would do more harm than good. Because Henricks's statement regarding her supervisor's intentions with respect to Whitbeck's sales territory would have explained Whitbeck's state of mind when she decided against going to him, the statement was relevant for this non-hearsay purpose. *See United States v. Baird,* 29 F.3d 647, 653 (D.C.Cir.1994). Indeed, that Whitbeck had not offered Henricks's statement for its truth is clear from the fact that the underlying question of the supervisor's intentions regarding Whitbeck's territory was entirely irrelevant to her case. Whitbeck's lawyer more than adequately conveyed the purpose of the proffered testimony at a bench conference: "[I]t's not hearsay in that we're not admitting it for the truth. . . . It has to do with what her state of mind was and why she was not assertive in going to [Henricks's supervisor]." Tr. 10/28/97 at 85–86.

■ The magistrate judge's error, however, was harmless because the rebuttal evidence Whitbeck sought to introduce was only minimally probative of why she kept quiet. For one thing, Henricks's statement suggesting that her supervisor had considered eliminating Whitbeck's territory occurred months before the April 28 conversation in which Henricks allegedly forbad Whitbeck from using a motorized cart; as such, it amounted to relatively weak state-of-mind evidence. Moreover, nothing in Whitbeck's proffered testimony would have explained why she

failed to tell anyone else at Vital Signs—such as colleagues, human resources officers, or management other than Henricks's supervisor—that Henricks had denied her request for an accommodation. Indeed, in a subsequent letter to the CEO of Vital Signs proposing to return to work on a part-time basis, Whitbeck never even hinted that Henricks had refused to accommodate her disability. Given the evidence of these other omissions, we cannot say that the magistrate judge's erroneous exclusion of Henricks's statement affected Whitbeck's "substantial rights." FED. R. CIV. P. 61.

## IV

■ We turn finally to Whitbeck's contention that the magistrate judge erred in refusing to allow two of her witnesses—her neighbor and sister-in-law—to testify about statements that she allegedly made to them regarding the disputed conversation with Henricks. According to the magistrate judge, the proffered testimony was hearsay. Whitbeck argues (as she did to the magistrate judge) that her statements to her neighbor and sister-in-law describing her conversation with Henricks qualified as non-hearsay under the "prior consistent statement" provision of Federal Rule of Evidence 801(d)(1)(B). Rule 801(d)(1)(B) provides that out-of-court statements are not hearsay if they are "consistent with the declarant's testimony and ... offered to rebut an express or implied charge against the declarant of recent fabrication." Because such statements are only admissible to rebut a specific allegation of motive for fabrication—not to bolster the declarant's general credibility—the statements must have occurred before the alleged motive originated. *See Tome v. United States,* 513 U.S. 150, 156–60, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995).

We think that the proffered testimony satisfied the requirements of Rule 801(d)(1)(B). Because Vital Signs directly challenged Whitbeck's credibility by introducing evidence from which the jury could infer that she fabricated her account of the conversation with Henricks, Whitbeck sought to rehabilitate herself by introducing evidence that shortly after the conversation she told her neighbor and her sister-in-law what Henricks had said. These statements were admissible because she made them months before learning that she would not receive long-term disability benefits, the event that Vital Signs claimed furnished her motive to lie.

■ Once again, the magistrate judge's error was harmless. Given the substantial rehabilitative testimony that Whitbeck actually elicited from these and other witnesses, the marginal value of the excluded statements would have been slight. The neighbor testified that Whitbeck seemed "upset" and "physically shaken" by her conversation with Henricks, and that Whitbeck was "confused" and "wasn't sure exactly what to do because of what [Henricks] had said to her." Tr. 10/28/97 at 103–04. The sister-in-law testified that after the conversation Whitbeck appeared "depressed" and that "her personality totally changed." *Id.* at 112. She also testified that Whitbeck had "[d]efinitely not" told her that she wanted to retire from Vital Signs on long-term disability. *Id.* at 113. And the motorized cart salesman testified that Whitbeck told him that she could not buy a cart from him because "they didn't go for the idea of using the [cart] to get to work." Tr. 10/27/97 at 19. Because Whitbeck could have relied on all of this testimony to rebut Vital Signs's allegation that she lied about what Henricks said to her, the magistrate judge's error was harmless.

## V

The verdict in favor of Vital Signs is affirmed.

So ordered.