# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 23, 2020          Decided August 13, 2021

No. 19-7074

DERWIN PATTEN, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-00732)

*Thomas T. Ruffin Jr.* argued the cause and filed the briefs for appellant.

*Carl J. Schifferle*, Deputy Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With him on the brief were *Karl A. Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General, and *Caroline S. Van Zile*, Deputy Solicitor General.

Before: ROGERS, KATSAS, and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

2

KATSAS, *Circuit Judge*: The Randolph-Sheppard Act creates state-administered programs for blind individuals to operate vending facilities on federal property. The Act also creates a grievance scheme for vendors to challenge a state's operation of its program. This case presents the question whether a vendor may bypass that scheme when challenging the operation of a Randolph-Sheppard program under other statutes that prohibit discrimination based on disability.

I

A

The Randolph-Sheppard Act (RSA) gives licensed blind individuals a priority to operate vending facilities on federal property. 20 U.S.C. § 107(b). State and federal agencies share responsibility for administering the RSA. On the federal level, the Secretary of Education promulgates implementing regulations and designates a state agency to administer the program within each state and the District of Columbia. *Id.* § 107a(a). The designated state agency licenses eligible vendors, seeks appropriate placements for them, promulgates further regulations, and monitors vendors for compliance. *Id.* § 107a(b), (c). The state agency must give vendors training materials and access to financial data regarding its operation of the program. 34 C.F.R. §§ 395.11–.12.

The RSA sets forth a grievance scheme for vendors to challenge a state's operation of its Randolph-Sheppard program. The statute provides that "[a]ny blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing." 20 U.S.C. § 107d-1(a); *see also id.* § 107b(6) (state licensing agency must provide "an opportunity for a fair hearing"). A licensee dissatisfied with the results of that hearing may seek

further review before the Secretary, who must "convene a panel to arbitrate the dispute." *Id.* § 107d-1(a). The panel consists of two arbitrators designated by the licensee and the state agency respectively, and a third arbitrator jointly designated by the other two. *Id.* § 107d-2(b). The panel's decision is subject to judicial review as final agency action under the Administrative Procedure Act. *Id.* § 107d-2(a).

In the District of Columbia, the designated licensing agency is the Rehabilitation Services Administration, a component of the District's Department on Disability Services. Its implementing regulations set forth both substantive rules and grievance procedures. The Administration must enter into an operating agreement with each licensed vendor, which must set forth both the duties of the vendor and the responsibilities of the Administration to provide various forms of assistance. 29 D.C. Mun. Reg. (DCMR) § 206. Regulations elaborate on how the Agency must train vendors, *id.* § 210, and what financial information it must make available to them, *id.* § 216. In addition, the Administration must give vendors various documents about the program's operation, *id.* § 217.1; must consult with a blind vendors' committee about program operations, *id.* § 211.1; and must equip and initially stock each covered vending facility, *id.* § 202.1. As to grievance procedures, a vendor "dissatisfied with any licensing agency action arising from the operation or administration of the Program" may seek either an informal meeting with an appropriate agency official or a hearing before the D.C. Office of Administrative Hearings (OAH). *Id.* § 218.2(b). The vendor may appeal an adverse OAH order either to the D.C. Court of Appeals, as permitted by D.C. law, or to the Secretary, as provided by the RSA. *Id.* § 218.2(c).

4

B

The plaintiffs are current and former vendors in the District's Randolph-Sheppard program. They claim that the District has discriminated against them, based on their blindness, in its administration of the program. As relevant here, they contend that the District conducts discriminatory inspections of vending facilities and that it fails to provide aids such as human or electronic readers. The plaintiffs did not challenge these alleged practices through the Randolph-Sheppard grievance procedure. Instead, they filed a lawsuit in federal district court, which alleged disability-based discrimination in violation of Title II of the Americans with Disabilities Act (ADA), section 504 of the Rehabilitation Act, and the District of Columbia Human Rights Act (DCHRA).

The district court dismissed the case for failure to exhaust administrative remedies under the RSA. The court reasoned that exhaustion was required because the claims challenged the District's operation or administration of its Randolph-Sheppard program, even if the claims also arose under the anti-discrimination statutes. *Brooks v. District of Columbia*, 375 F. Supp. 3d 41, 44–48 (D.D.C. 2019). The court further rejected the plaintiffs' argument that exhaustion would be futile because the OAH assertedly lacks jurisdiction to hear claims under the RSA. *Id.* at 48–49.

After the plaintiffs appealed the dismissal, they moved for relief from judgment under Federal Rule of Civil Procedure 60(b)(3). The district court denied the motion, and the plaintiffs did not separately appeal that denial.

II

The principal question on appeal is whether the vendors were required to exhaust administrative remedies under the

RSA before filing their discrimination claims in federal court. That is a legal question, which we review *de novo*. *Artis v. Bernanke*, 630 F.3d 1031, 1034 (D.C. Cir. 2011).

We first consider the RSA grievance scheme, and we then address how it interacts with the anti-discrimination statutes.

A

We begin with the RSA scheme. One of our cases described exhaustion under the RSA as a "jurisdictional" requirement for judicial review. *Comm. of Blind Vendors of D.C. v. District of Columbia*, 28 F.3d 130, 133 (D.C. Cir. 1994). But later Supreme Court decisions have clarified that an exhaustion requirement is jurisdictional only if Congress "clearly states" as much. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515–16 (2006). Section 107d-1(a) contains no such clear statement, so it is not jurisdictional.

Nonetheless, exhaustion under the RSA scheme is mandatory, as this Court held in *Randolph-Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 101–04 (D.C. Cir. 1986). As noted above, the RSA provides that "[a]ny blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a State licensing agency a request for a full evidentiary hearing." 20 U.S.C. § 107d-1(a). Although the word "'may' is ordinarily … permissive," we held that structural and contextual considerations "defeat[] any inference" that the grievance scheme is optional. *Weinberger*, 795 F.2d at 102 n.19. In particular, the RSA "establishes a clear and explicit system for resolution of disputes," it "specifically conditions resort to the Secretary on initial action by the state licensing agency," and it makes an arbitration decision judicially reviewable as final agency action. *See id.* at 102–03. We found it "unlikely" that "an aggrieved party could,

whenever it chose, circumvent the system and seek *de novo* determination in federal court." *Id.* at 103. Thus, we held that the RSA exhaustion provision is mandatory for claims to which it applies. *Id.* at 104.

B

The RSA grievance scheme squarely covers the claims in this case. Again, the scheme extends to "[a]ny blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program." 20 U.S.C. § 107d-1(a). The double use of the word "any" signifies breadth. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008). And we have previously interpreted the phrase "arising from" to mean "originate or stem from." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1260 (D.C. Cir. 2020) (cleaned up). The exhaustion requirement thus applies so long as the aggrieved parties are licensees and the challenged actions involve operation or administration of the program. The plaintiffs here are current or former licensees, and they challenge actions that involve program administration.

Counts 1 through 3 of the complaint have evolved during this litigation. Initially, the plaintiffs alleged that the District inspected their facilities through poorly trained Administration monitors instead of through the Department of Health. But the District proved that the Department did perform inspections. Then, the plaintiffs complained of having to endure inspections from both the Administration and the Department, whereas sighted proprietors were inspected only by the Department. Either way, these claims challenge the program's monitoring procedures or the quality of its monitors, which go directly to program operation or administration. Under the RSA, a state licensing agency must monitor compliance with program rules and regulations. 20 U.S.C. § 107a(b). And like all vendors,

the plaintiffs entered into operating agreements specifically setting forth how the Administration would supervise them. 29 DCMR § 206.2(b). Monitoring and inspection procedures clearly involve operation and administration of the program.

Counts 4 through 6 of the complaint challenge the Administration's alleged failure to provide auxiliary aids, such as human readers and automated reading machines, so that vendors can read program documents. The plaintiffs argue that the Randolph-Sheppard program gives them no right to auxiliary aids, and thus does not cover their claims. But whether the program entitles vendors to auxiliary aids is beside the point, for the decision not to provide them involves program operation and administration regardless. Moreover, the Randolph-Sheppard program does give blind vendors affirmative rights to "effective" training programs covering "all aspects of vending facility operation for blind persons," 34 C.F.R. § 395.11, as well as access to financial information about the state licensing agency's operation of the program, *id.* § 395.12. And the D.C. implementing regulations further require the Administration not only to give blind vendors copies of all "documents relating to the operation of the Program," but also to "explai[n]" to them the "content of the documents." 29 DCMR § 217. In seeking aids to read program documents, the vendors necessarily invoke access rights under these provisions. The claims for auxiliary aids thus also involve program operation and administration.

Because the RSA grievance scheme is mandatory and covers the plaintiffs' claims, the RSA required the plaintiffs to

exhaust their administrative and arbitral remedies before seeking judicial review.

## C

The plaintiffs seek to avoid the RSA grievance scheme by raising claims only under anti-discrimination statutes. They further argue that exhaustion would have been futile because the OAH does not have jurisdiction over RSA claims. We reject both contentions.

## 1

The vendors argue that exhaustion was not required because they seek to pursue claims only under the ADA, the Rehabilitation Act, and the DCHRA. But even if the claims here fall within those anti-discrimination statutes as well as within the RSA, we conclude that the RSA grievance scheme nonetheless applies.

In seeking to harmonize the RSA with the anti-discrimination statutes, we must engage in the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination." *United States v. Fausto*, 484 U.S. 439, 453 (1988). We are guided by the "old and familiar rule" that "the specific governs the general," which is "particularly true" where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645–46 (2012) (cleaned up). These principles control this case: The RSA imposes a comprehensive, two-level system of administrative and arbitral review for challenges to the operation or administration of a Randolph-Sheppard program. And the

RSA is far more specific than any of the three anti-discrimination statutes.

*Thunder Basin Coal Company v. Reich*, 510 U.S. 200 (1994), confirms this analysis. There, the Supreme Court articulated a two-part test to determine whether parties must channel claims through an available administrative scheme in order to seek judicial review. First, we consider whether the text and structure of the governing statutes make it "fairly discernible" that Congress "intended to preclude initial judicial review" prior to exhaustion. *Id.* at 207 (cleaned up). If so, we then consider whether the claims at issue are "of the type" that must first be exhausted. *Id.* at 212. In *Thunder Basin*, the Court applied this framework to require mining companies to exhaust available administrative remedies under the Federal Mine Safety and Health Amendments Act of 1977 before seeking judicial review of a claim that the mining regulation at issue violated the National Labor Relations Act. *See id.* at 207–16. Likewise, in *Elgin v. Department of the Treasury*, 567 U.S. 1 (2012), the Court applied *Thunder Basin* to require disciplined federal employees to exhaust available administrative remedies under the Civil Service Reform Act before seeking judicial review of a claim that the statute under which they were disciplined was facially unconstitutional. *See id.* at 10–23.

The *Thunder Basin* test is satisfied here. To begin, the detailed, precise, and comprehensive nature of an administrative-review scheme counts against immediate resort to federal district court. *See, e.g.*, *Elgin*, 567 U.S. at 10–12; *Thunder Basin*, 510 U.S. at 207–09; *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019); *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 499–500 (D.C. Cir. 2018). As we explained in *Weinberger*, the RSA establishes just such a scheme, which prompted us to describe it as "exclusive." *See* 795 F.2d at 103–04. Given the "painstaking detail" with which

the RSA sets forth an administrative and arbitral scheme to resolve vendor grievances, the intent to make the scheme exclusive is "fairly discernible." *See Elgin*, 567 U.S. at 11–12.

To decide whether a specific-review scheme covers the claims at issue, we must consider whether the claims are "wholly collateral" to the scheme, whether application of the scheme would "foreclose all meaningful judicial review," and whether the claims are "outside the agency's expertise." *See, e.g.*, *Elgin*, 567 U.S. at 15; *Thunder Basin*, 510 U.S. at 212–13. As shown above, the disputed claims here are not wholly collateral to the scheme, but instead challenge core aspects of the "operation or administration of the vending facility program" of the District. 20 U.S.C. § 107d-1(a). The clarity with which the statute covers these claims would likely be dispositive, but we note that the other *Thunder Basin* considerations point in the same direction.

The RSA provides that any final arbitral determination is subject to judicial review through the Administrative Procedure Act, *see* 20 U.S.C. § 107d-2(a), so requiring exhaustion would merely postpone—rather than preclude—a judicial assessment of the plaintiffs' claims. In this respect, the case for exclusivity here is even stronger than it was in *Thunder Basin* and *Elgin*. In those cases, the administrative scheme led to final agency action reviewable only in a court of appeals, thereby precluding district-court jurisdiction altogether. *See Elgin*, 567 U.S. at 10; *Thunder Basin*, 510 U.S. at 208. The plaintiffs there argued that they could receive no meaningful review because the agency lacked the authority to decide their constitutional claims, and the court of appeals lacked the ability to develop the factual record needed to resolve them. The Supreme Court nonetheless concluded that court-of-appeals review was good enough. *See Elgin*, 567 U.S. at 16–21; *Thunder Basin*, 510 U.S. at 215. But here, the RSA grievance

scheme channels claims into the district court. So once the administrative process has run its course, a vendor then may pursue discrimination claims there.

As for agency expertise, the claims here plainly implicate the Administration's authority and expertise as the state agency administering a program to assist blind vendors. The plaintiffs briefly suggest that the OAH lacks authority to resolve their discrimination claims. But even if that were true, one part of the available administrative process involves meeting with the Administration's Chief of its Division of Services for the Blind, who clearly has relevant expertise. 29 DCMR § 218.2(b)(1). Another part involves review before an arbitral panel that, because it is appointed directly or indirectly by the affected parties, presumably also has relevant expertise. 20 U.S.C. § 107d-2(b)(1). As to the OAH itself, even if it did not directly resolve claims of disability-based discrimination, its expertise could still "be brought to bear on" those issues. *Thunder Basin*, 510 U.S. at 214–215; *see Elgin*, 567 U.S. at 22–23. For example, administrative expertise on what counts as "effective" training programs for blind vendors under the RSA, *see* 34 C.F.R. § 395.11, might be highly informative for a judge considering what constitutes a reasonable accommodation for blind vendors under the ADA.

The RSA scheme is not only comprehensive, but also far narrower than the anti-discrimination statutes invoked by the plaintiffs. The RSA applies only in one narrow context—the operation of vending facilities on federal property. And it benefits only one category of disabled individuals—the blind. In contrast, Title II of the ADA forbids any public entity from discriminating based on any type of disability, 42 U.S.C. § 12132; section 504 of the Rehabilitation Act forbids any federally funded program or activity from discriminating based on any type of disability, 29 U.S.C. § 794(a); and the DCHRA

prohibits all types of disability-based discrimination by any District agency, D.C. Code § 2-1402.73. These statutes cover many more programs and many more categories of disability than does the RSA.

Allowing challengers to proceed through a more general statute is particularly inappropriate when doing so would eviscerate specific requirements of the narrower scheme. *See*, *e.g.*, *EC Term of Years Tr. v. United States*, 550 U.S. 429, 433 (2007); *Brown v. GSA*, 425 U.S. 820, 834 (1976). Here, the anti-discrimination statutes define a state agency's failure to make reasonable accommodations as a form of disability-based discrimination. *See*, *e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 531–33 (2004) (ADA); *Alexander v. Choate*, 469 U.S. 287, 300–01 (1985) (Rehabilitation Act); *Whitbeck v. Vital Signs, Inc.*, 116 F.3d 588, 591–93 (D.C. Cir. 1997) (DCHRA). Thus, almost any RSA claim by blind vendors—that a state licensing agency has improperly administered or operated a program designed to afford them a preference—could be recast as a claim that the agency has not reasonably accommodated their disability. Under the plaintiffs' theory, the RSA's grievance scheme, which we have specifically held to be mandatory, would become optional in most if not all cases to which it applies. That is not a sensible reading of the statutes at issue, which we must interpret "as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018).

For these reasons, we hold that the plaintiffs had to proceed through the RSA grievance procedure before pursuing their discrimination claims in court.

2

Alternatively, the plaintiffs ask us to excuse their failure to exhaust on futility grounds. We have previously considered

whether the RSA exhaustion requirement permits exceptions for futility. *See Weinberger*, 795 F.2d at 106–07. In *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Supreme Court subsequently held that courts may not impose judge-made exceptions on statutory exhaustion requirements, though they may continue to impose exceptions on judge-made exhaustion requirements. *See id.* at 1856–57. We need not decide whether *Ross* forecloses any futility exception to the RSA exhaustion requirement, which we inferred from the comprehensiveness of the grievance scheme, *see Weinberger*, 795 F.2d at 100–04. Assuming that a futility exception still exists, we conclude that it does not apply here.

Any futility exception would apply, if at all, "in only the most exceptional circumstances." *Weinberger*, 795 F.2d at 106 (cleaned up). Thus, "resort to arbitration must appear clearly useless, either because the agency charged with arbitration has indicated that it does not have jurisdiction over the dispute, or because it has evidenced a strong stand on the issue in question and an unwillingness to reconsider the issue." *Id.* at 105–06 (cleaned up). The plaintiffs do not argue that the OAH has ever disclaimed jurisdiction over RSA claims. By contrast, the District cites many RSA cases heard by the OAH, including some brought by the plaintiffs. And the OAH's website explains that "[a] blind vendor who objects to any DDS/RSA decision may appeal to the [OAH]." *Department on Disability Services*, DC.gov, https://oah.dc.gov/page/department-disability-services (last visited August 4, 2021).

The parties dispute whether the OAH may properly hear RSA claims. In affirming a recent OAH decision involving one of the plaintiffs here, the D.C. Court of Appeals reserved this issue. *Patten v. D.C. Dep't on Disability Servs.*, 248 A.3d 116, slip op. at 7 (D.C. 2021) (unpublished table decision). But in doing so, the court stressed that the OAH continues to decide

RSA cases, and it expressly refused to "upend" that "practice." *Id.* at 8. In other words, the plaintiffs raise an objection that the Court of Appeals has declined to adopt and that runs counter to longstanding OAH practice in RSA cases. The plaintiffs thus have not shown that the OAH would "certainly, or even probably," have refused to consider their claims. *Weinberger*, 795 F.2d at 106–07. No futility exception could apply here.

## III

Finally, the plaintiffs seek to challenge the district court's denial of their Rule 60(b)(3) motion for relief from judgment. But although the plaintiffs timely appealed the district court's order dismissing this case for failure to exhaust, they did not appeal that court's later denial of their Rule 60(b)(3) motion.

Our jurisdiction extends to appeals from "final decisions," 28 U.S.C. § 1291, that are appealed within 30 days, *see id.* § 2107. A denial of a Rule 60(b) motion is final and thus appealable. *Browder v. Dir., Dep't of Corr.*, 434 U.S. 257, 263 n.7 (1978). Yet, the plaintiffs failed to appeal the denial in this case. And the denial of a post-judgment motion under Rule 60 does not merge into an earlier final-judgment appeal. *See* Fed. R. App. P. 4(a)(4)(B)(ii) (to "challenge an order disposing of any motion" under Rule 60, a party must timely file a new or amended notice of appeal); *United States v. Cunningham*, 145 F.3d 1385, 1393 (D.C. Cir. 1998) (rejecting "the proposition that a timely-filed notice of appeal automatically includes appeal of a subsequently-denied post-trial motion"). Because the plaintiffs failed to file a timely notice of appeal from the denial of their Rule 60(b)(3) motion, as required under section 2107, we lack jurisdiction to review the denial. *See Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 20–21 (2017).

15

IV

We affirm the dismissal of the complaint for failure to exhaust, and we dismiss the challenge to the denial of the Rule 60(b)(3) motion for lack of appellate jurisdiction.

*So ordered.*